UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                       REPORT AND RECOMMENDATION

Larry Eugene Burrell, and
Tameika Lalonie Brown,

        Defendants.          Crim. 06-81 (01-02)(JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendants Larry Eugene Burrell ("Burrell"), and Tameika Lalonie Brown ("Brown"):

    1.      Burrell's Motion to Suppress Statements.

    2.      Brown's Motion to Suppress Statements.

    3.      Burrell's Motion to Suppress Evidence Obtained as
          a Result of Search and Seizure.

4.      Brown's Motion to Suppress Evidence Obtained as
a Result of a Search and Seizure.

A Hearing on the Motions was conducted on April 12, 2006,[1] at which time, Burrell

appeared personally, and by Paul Applebaum, Esq.; Brown  appeared personally, and

by Gary R. Bryant-Wolf, Esq.; and the Government appeared by Clifford B.

Wardlaw, Assistant United States Attorney.

For reasons which follow, we recommend that each of the Defendants'

Motions be denied.

## II. Factual Background

The Defendants are each charged with one Count of Conspiracy with intent to

distribute crack cocaine, in violation of Title 21 U.S.C. §§841(b)(1)(A),841(b)(1)(B),

and 846; one Count of Aiding and Abetting Possession, with the intent to distribute,

crack cocaine, in violation of Title 21 U.S.C. §§841(a)(1), and (b)(1)(A), and Title 18

U.S.C. §2; one Count of Aiding and Abetting Possession, with the intent to distribute,

powder cocaine, in violation of Title 21 U.S.C. §§841(a)(1), and (b)(1)(B), and Title

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motions.  Leave was granted, and the last submission on the issues was received on April 21, 2006, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

18 U.S.C. §2; and one Count of Possession of a firearm during a drug trafficking crime, in violation of Title 18 U.S.C. §§924(c)(1)(A), (c)(1)(B)(ii), and 2.  The events which gave rise to the conspiracy charge are alleged to have taken place during January of 2006, while the events which gave rise to the charges of aiding and abetting possession, as well as the charge of possessing a firearm during a drug trafficking crime, are alleged to have taken place on January 14, 2006.  All of the events are alleged to have occurred in this State and District.  As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized, as they were developed during the testimony of three witnesses who were called by the Government.[2]

A.      Burrell's Traffic Stop and Processing at the Beltrami County Jail.

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At the Hearing, the Government called Steven Rankin ("Rankin"), who is a Deputy with the Beltrami County Sheriff's Department, and Troy Coyle ("Coyle"), who is a Corrections Officer for the same Department, to testify as to Burrell's traffic stop, and to his processing at the Beltrami County Jail.

Rankin testified that, on January 13, 2006, while on-duty, he observed a light-colored automobile, which appeared to have windows that were tinted in excess of the opacity allowed under Minnesota law. Rankin stopped the automobile, and tested the automobile's windows, using a tint-meter, in order to determine if they were compliant with Minnesota law. He then asked the driver for his driver's license and name, at which time, the driver identified himself as "Larry Burrell." Rankin radioed Burrell's identity to his dispatcher, who responded that Burrell's license had been revoked. Rankin also received a message on his pager, from the dispatch center, which recommended caution in dealing with Burrell.

Rankin noted that Burrell's drivers license listed a Minneapolis address, and he concluded that there was a substantial likelihood that Burrell would not respond to a Summons. Based on that conclusion, Rankin placed Burrell under arrest, for driving with a revoked license, and he transported him to the Beltrami County Jail. Burrell's

automobile was towed to the Beltrami County Law Enforcement Center, and placed into storage.

Upon arrival at the Jail, Rankin assisted Coyle in processing and booking Burrell, at which time, Burrell was handcuffed and sitting on a chair. Rankin read an implied consent advisory to Burrell, because he suspected that Burrell was under the influence, and he intended to test Burrell for intoxication. Burrell responded that he had earlier consumed marijuana before driving his automobile, and he displayed watery eyes which were consistent with intoxication. Rankin proceeded to prepare a urine kit, while Coyle removed Burrell's handcuffs. Afterwards, Burrell -- while seated -- turned away from both Rankin and Coyle; an action that both officers regarded as suspicious. Coyle testified that he believed Burrell was attempting to hide something -- potentially a weapon -- and therefore, he grabbed Burrell's hands, and asked him what he was holding. Burrell then opened his palms to reveal that he was holding a small plastic baggie in each hand, each of which appeared to contain narcotics. Coyle testified that he did not question Burrell, except for asking him what he had concealed in his hands. At that point, Rankin resecured Burrell, and escorted him to a holding cell.

As a result of the discovery of contraband, Rankin performed an additional search of Burrell's person, and found a large baggie, which was protruding from Burrell's rectal area, and which appeared to contain narcotics similar to those held in the previously discovered baggies. Afterwards, Burrell volunteered that he had a bag of marijuana secured to his genitals, and he asked if Rankin wanted that as well. Rankin testified that neither he, nor any other law enforcement officer, had asked Burrell if he had any drugs on his person, or any other questions.

Rankin then testified that he read, for the second time, an implied consent advisory to Burrell. However, Rankin testified that he did not question Burrell, or make any other comments to Burrell, while he was in custody. Upon the discovery of the bag that was secured from Burrell's rectal area, Rankin contacted a narcotics agent.

B.    The "Knock and Talk" Interview of Brown.

Phil Hodapp ("Hodapp"), who is a Special Agent with the Bureau of Criminal Apprehension, was not called to testify at the Hearing, as the parties stipulated to our consideration of the Motions to Suppress on the transcripts of Hodapp's interviews of Brown, which we now proceed to detail.

Hodapp had been involved in the investigation of Burrell's alleged drug trafficking activities. See, <u>Government Ex. 2</u>, at p. 3. Hodapp had learned, from a Confidential Reliable Informant ("CRI"), that Burrell was involved with a woman, who was later identified as Brown.

After Burrell's arrest, law enforcement officers contacted area hotels, and motels, in order to determine if Burrell had been a registered guest, or if any persons had observed a white Lexus similar to the one that Burrell was driving. A concerned citizen informed investigators that a white Lexus had been observed at Brown's residence, where a vehicle registered to Brown was also observed. Hodapp and Robert Carlson ("Carlson") drove to Brown's residence in order to attempt a "knock and talk" interview with Brown. The interview was recorded, and a transcript of that interview was offered, and admitted, into evidence. See, <u>Government Ex. 3</u>.

Upon arriving at Brown's residence, Hodapp and Carlson introduced themselves to Brown, and Brown identified herself as well. The officers asked if they could come inside and speak with her for a minute, and Brown stated "you sure can, I'm cookin' right now," and told them to enter, and to take off their shoes. <u>Id.</u> at 2. Upon entering, the officers informed Brown that a situation had developed in town, and Brown was asked if she was affiliated with Burrell. She responded: "I'm his

babies' mama, yes."   Id.  Hodapp again asked if they could "come in and sit down and talk," and Brown replied "you sure can."   Id.

The officers then informed Brown that Burrell had been taken into custody. Brown responded, "I think he's in jail, I'm like okay what he do?"   Id. at 4.  The officers explained that Burrell had been driving with a revoked license, and then asked if she had seen Burrell since he had arrived in town.  The officers further explained that they had found narcotics on Burrell, and that they wanted to speak with her because they knew she was involved with him, and if she knew what "he might be doing involving narcotics."   Id. at 6.  Brown explained that she had just moved to the Bemidji area, and that she rarely saw Burrell.  Hodapp then asked if she knew anything about the controlled substances that Burrell had in his possession, and she denied any such knowledge.  The officers asked Brown to give her name, date of birth, address, and phone numbers, and then asked when Burrell had arrived at her residence.  Brown responded that he came to her residence during the early morning hours, before she had awakened her daughter.  Id. at 10.   She also stated that Burrell left around 10:00 o'clock a.m.

Brown then inquired as to the kind of controlled substances that were found on Burrell's person, and the officers identified the substances as cocaine.   Brown

expressed surprise, and she stated that she only smoked cigarettes.  Hodapp then asked Brown if she had any involvement with Burrell's alleged narcotics trafficking.  She denied any involvement, and stated that she had four (4) kids to raise.  She then reiterated that she was not involved in any drug trafficking, and that she was unaware of Burrell's business dealings.  Id. at 12.

After some conversation about her housing assistance, Hodapp told her that he believed she was telling the truth about her involvement with Burrell's affairs, and that he was concerned about exposing Brown's children to narcotics.  He then asked if Burrell had brought anything with him when he visited, and Brown responded that he had not arrived with any belongings, other than his automobile.  Id. at 15.

Hodapp inquired if Brown's residence had a garage, and if she would mind if they "took a look around [to] see if there's anything here," and if doing so would "bother [her] at all."  Id. at 15.  Brown responded:

> Well actually it would because I ain't got nothin' to do with him, you know what I'm sayin'.  I have nothin' to hide honestly in my house, you know what I'm sayin'.  But I would feel uncomfortable you lookin' around, I mean what are you lookin' for.  What is there to look for?

Id. at 15-16.

The officers confirmed that Brown had told them that Burrell had stopped by during the early morning hours, and that he did not arrive with anything.  Hodapp asked if "it was possible that [Burrell] could have left something behind here that you don't know about."  Id. at 17.  Brown stated:

> It could be but I know he didn't come here, he didn't come here with anything in his, whatever he had in his pockets he didn't put nothin' out on no table or nothin'.  He just came in, how you doin', we kicked it we talked.  He finally left around ten somethin' this mornin', just after me doin' my business and things I had.

Id.

Hodapp then stated it was "possible that while you were gone he could have left something here," and Brown responded:

> It probably is but I mean I'd rather you come back with a search warrant.  If -- if that's how you gotta do it then I mean I, but I'm not gonna let you search my house 'cuz he don't live here.
>
> *     *     *
>
> The person's name that's on this unit is Tameika Brown. Whatever he, you know what I'm sayin he only came here to visit me today that's why I'm shocked myself that you guys are even at my door.  I don't get down with that, and I mean I'm comin', I'm just bein' personal from you to me, you know what I'm sayin'.  You guys come in here you wanna search, I'm not gonna let you search because he don't live here.

- 10 -

Id. at 17-18.

Hodapp and Brown then discussed the possibility that Burrell could have left narcotics

at various houses in the area that he had visited, and Brown stated that "he probably

left some there too."  Id. at 19.  Hodapp and Brown then had the following exchange:

> Hodapp:     And that's why ah, you know, if -- if you
> cooperate with us and ah let us * * *
>
> Brown:     And I am but I'm gonna tell you now I rather
> you get a search warrant to come so you can thoroughly
> check this muthafucka I'm not gonna let you look in my
> house.  I'm tryin' to cook for my kids.  My daughter's
> asleep, I haven't even unwrappered her.  I just got here
> tryin' to * * *.
>
> Hodapp:     Well okay.  Tameika you -- you mentioned it
> and --  and that is exactly what we will do is get a search
> warrant and what we're gonna do right now is freeze this
> house until we can get here with, get a search warrant
> written.
>
> Brown:     What do you mean freeze?
>
> Hodapp:     That means we're gonna have officers come in
> here and we're gonna secure your house until * * *.
>
> Brown:     While you're sitting here?
>
> Hodapp:     Yup and I'm gonna go into town and write a
> search warrant 'cuz you won't give us permission to
> search.  Okay.

Brown:      Oh God, what you wanna do?

Hodapp:      Well it's -- it's.

Brown:      Here's the garage * * * here's the washer and dryer (LAUGHS).

Hodapp:      You've already told us that you don't want us to -- to search.

Carlson:      You guys come on in we're gonna freeze the house up.

Hodapp:      Tell 'em ah, I -- I have to go get, I'll go write this down on paper.  Tameika, that -- that safe out there.

Brown:      Yeah, I mean I don't, you see I really don't go in my garage so you know I don't know what.

Hodapp:      Who's -- who's safe is that?

Brown:      I don't know.

Hodapp:      You -- you never seen that before?

Brown:      I haven't even been to my garage, you know what I'm sayin'.  These are my dishes.

<u>Id.</u> at 19-21.

Hodapp then told Brown that he would secure a Search Warrant, and that she should feel free to feed her children.  <u>Id.</u> at 21-22.  He also directed Brown not to make any

- 12 -

phone calls until he had left, and he then made arrangements to go back into town and obtain a Search Warrant.  The recording ends at 7:15 o'clock p.m.

      C.     <u>Interview with Brown in Connection with the Execution of the Search Warrant</u>.

      On January 13, 2006, at 9:47 o'clock p.m., Hodapp returned to Brown's residence to execute the Search Warrant.[3]  <u>Government Ex. 4</u>.  Hodapp informed Brown that she was not under arrest, was not in custody, and that he was there in order to execute a Search Warrant.  <u>Id.</u> at 1-2.  Brown confirmed that the officers present had not made any promises, nor any threats, regarding any potential criminal charges, and that they had waited quietly for Hodapp's return.  <u>Id.</u> at 2.  Hodapp then informed Brown that the officers had opened the safe in Brown's garage, and had discovered crack cocaine, as well as ammunition.  Brown expressed great surprise. Hodapp asked Brown if the officers would discover anything else while searching the house, and Brown stated that she had only lived there for eight (8) days, and she recounted the earlier events of the day.

_____

[3]In the transcript of the interview, Hodapp states that the date is January 13, 2005.  However, given the events referenced in the interview, and the date of the Search Warrant, Hodapp's reference to "2005" is in error.

Hodapp repeated Brown's earlier comments, which reflected that Burrell had not arrived with anything upon his visit to Brown's residence.  Hodapp also recounted that Brown had refused to consent to a search of the house, and Brown replied that her refusal resulted from her need to feed her children.  Id. at 3-4.  Hodapp then asked if Brown possessed any guns in the residence, and she replied that she did not own any.

Hodapp explained the general procedure for obtaining evidence, and informed Brown that they would be taking fingerprints from the items, and asked if her prints would be found on any of the items seized by law enforcement.  Brown stated that she had not handled any of the drugs, and had not been inside of the safe.  At that point, Hodapp informed Brown that he would turn off the recorder.

At 9:54 o'clock p.m., the recorder was turned back on, and Hodapp recounted Brown's earlier statements.  Id. at 6-7.  Upon inquiry, Brown stated that she had last visited the master bedroom at 2:00 o'clock p.m.  Hodapp asked for assurance that Brown was being truthful, and he informed Brown that officers had found additional cocaine, a gun, a scale, and some baggies, in that bedroom.  Hodapp asked Brown if her fingerprints would be on those items.  Id. at 8.  Brown responded that all of those

- 14 -

belonged to Burrell, but she neither confirmed, nor denied, whether her fingerprints would be found on those items.  Id.

Brown then stated that "I really ain't even gotta be talking to you until I get my lawyer, you know what I'm saying?"  Id. at 9.  Hodapp replied that she did not need to speak to them, and that she was not in custody.  Brown then stated that "I'm not, so I'm gonna stop talking all in all," and that she would "just let you guys finish doing your * * * I don't."  Id. at 9.

At that point, Hodapp informed Brown that she was still being recorded, and that she was now under arrest.  Id. at 9.  Brown responded that she was assisting the officers with their investigation, and that she could not go to jail, because she needed to care for her children.  Hodapp then gave Brown a Miranda warning, see, Miranda v. Arizona, 384 U.S. 436 (1966), and asked her if she understood her rights.  Id. at 10.  Brown affirmed that she understood her rights.

Brown then reiterated that she had nothing to do with the contents of her garage.  Hodapp responded that the materials that were in her bedroom were "right there in front of God and everybody," and that "there's no way you could've missed it."  Id. at 11.  Brown continued to deny any involvement in Burrell's business.  Hodapp then

informed her that officers had found a gun, and "a whole bunch more dope," on the floor of the closet in her bedroom.

Brown stated that she had not been in her bedroom all day, at which point, Hodapp noted that she had earlier stated that she had last been there at 2:00 o'clock p.m.  Id. at 13.  Hodapp recounted his prior conversations with Brown, and noted that she had required them to obtain a Search Warrant, which he had done.  Hodapp asked, again, if her fingerprints would be found on the items in the bedroom, and told her that she had a chance to help her children, but "that's going away in a hurry and if you keep jacking me around, that is gonna be the end of it."  Id. at 15.

Hodapp stated that he knew that Brown had not been forthcoming, and he had the following exchange with her:

> Hodapp:     Well, I'm afraid that you're in trouble, now you gotta get yourself outta trouble and there's one way to begin that and that is to begin by telling us the truth.

> Brown:      Well, I mean.  I really don't have much to say, I, you know, me being nosy earlier probably (INAUDIBLE) that's about it.

> Hodapp:     So you knew you had a gun.

> Brown:      I mean, what am I to do?

> Hodapp:     Well, you got four kids here, for God's sakes.

Brown:     What am I, I mean, I was gonna move it, but I didn't, I * * *.

Hodapp:    So you had a gun.

Brown:     No, no, no, no.

Hodapp:    What about the drugs?

Brown:     Not I had a gun, I didn't have a gun, I noticed it in the box in the corner.

Hodapp:    Okay, what about the drugs?

Carlson:    I don't know about them, I'm, I'm being honest * * *.

Hodapp:    You're, you're saying you didn't notice em?

Brown:     Hmm?  I haven't been honest with ya.

Id. at 16-17.

Brown then admitted that she knew about the gun, but that she was confused, and scared, and did not know about the drugs.  She explained that she noticed the gun, and had never seen a gun like that in her life, and was curious.

Hodapp proceeded to recount their earlier conversations, and then confirmed that Brown had stated that she was unaware of the safe in the garage.  Hodapp highlighted what he believed were inconsistencies in Brown's earlier statements, and then explained that he would examine the evidence for fingerprints or DNA residue.

He stated that, "If you[r] DNA is in there or your fingerprints are in there, guess who's going to federal prison for a long time," for possession and distribution of controlled substances.  Id. at 20.

Hodapp stated that he believed that Brown had conspired with Burrell, and that he would take this case to the United States Attorney for prosecution in Federal Court, and that "you go to prison for a long time."  Id. at 21.  At that point, Brown admitted that she was once arrested for marijuana usage, and that she had been fingerprinted. Hodapp then asked if she would consent to submitting a DNA sample.  Brown asked if she had the right to withhold her consent, and  Hodapp replied that she did, but that he would then obtain a Search Warrant to obtain a DNA sample in the future.  Id. at 23.  He also stated that she should be happy to give a sample to prove her innocence.

Brown stated that she could still provide a sample, and that she was just calling Hodapp's "bluff."  She asked if she had the right to an attorney, which Hodapp confirmed.  Brown then stated, "I'll do it, if that's what you want me to do."  Id. at 24.  Hodapp replied, "I don't want to make you do," and then Brown stated that she would provide a sample as it was "no problem."  Id.  Hodapp reconfirmed that he had her consent, and he then acquired a DNA buccal swab from Brown.  Hodapp turned the recorder off at 10:15 o'clock p.m.

- 18 -

D.      Burrell's Subsequent Statements of January 19, 2006.

At the Hearing, the Government also presented testimony from Timothy Ball ("Ball"), who is a Special Agent with the Federal Bureau of Investigation ("FBI"). Ball testified that, on January 19, 2006, upon the issuance of an Arrest Warrant by a Federal Magistrate Judge, he went to the Beltrami County Jail in order to serve a Complaint on Burrell.  Ball testified that he told Burrell that he possessed a Federal Arrest Warrant, and that he subsequently had Burrell fingerprinted and photographed. Ball testified that he did not read Burrell a Miranda warning, as he understood that Burrell had already invoked his Miranda rights,  and accordingly, he did not plan to question him.

While in the booking room, Burrell spontaneously asked Ball, and the other law enforcement agents who were then present, if they knew who his younger brother was. At that time, and without any provocation from the agents, Burrell admitted that he was selling drugs in order to acquire money so as to secure his brother's release from jail, on bond, and that the drugs, as well as the firearm, which were found at the residence, were his.  He also stated that he did not live in Bemidji, or have a permanent residence, and that he was, instead, living with friends in Saint Paul, Minnesota.  Ball further

testified that he received Burrell's personal effects from the Beltrami County Jail, which included Burrell's car keys.

### III.  Discussion

A.    Burrell's Motion to Suppress Statements.

1.    Standard of Review.   Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).   Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984). Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal counsel during questioning.  See, Miranda v. Arizona, supra at 473; see also, Dormire v. Wilkinson, 249 F.3d 801, 804 (8th  Cir. 2001).  "The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" Davis v. United States, 512 U.S. 452, 458 (1994); see also, United States v. Ortiz, 315

- 20 -

F.3d 873, 885 (8th Cir. 2002).  Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him."  Id., citing North Carolina v. Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).

2.    Legal Analysis.  The Record demonstrates that Burrell had been administered a Miranda warning, by officials at the Beltrami County Jail, and that he had invoked his right to remain silent.  It also demonstrates, beyond any doubt, that the statements he made to Ball, Rankin, and Coyle, were unsolicited and spontaneous, and were not in response to any interrogation, or the functional equivalent of interrogation.  Accordingly, those statements were not obtained in violation of Miranda.  See, United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005)("Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer."), citing United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997); United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment, and is admissible with or without the giving of Miranda warnings.'"), quoting Rhode Island v. Innis, 446 U.S. 291, 299 (1980); see

also, United States v. Cody, 114 F.3d 772, 775 (8th Cir. 1997)(finding spontaneous statements made after the invocation of the right to silence admissible).

In addition, Burrell contends that, because Ball personally delivered the Federal Criminal Complaint, as opposed to other law enforcement officials, that Ball's purpose was to "see what type of reaction he could provoke when he slapped a federal complaint on Mr. Burrell." Burrell's Memorandum in Support of Motions to Suppress Statements and Evidence, Docket No. 52, at p. 4. However, Ball testified that he was aware that Burrell had invoked his right to remain silent, and had no intention of eliciting any statements from Burrell, by way of interrogation. Tellingly, Burrell has not cited any precedent to support the contention that the mere status of a Federal Agent, when delivering a criminal Complaint, is the functional equivalent to interrogation. Accordingly, finding no evidence that the spontaneous statements by Burrell were coerced, or were otherwise involuntary, we recommend that his Motion to Suppress Statements, be denied.

B.     Brown's Motion to Suppress Statements.

1.     Standard of Review.   For purposes of the Miranda inquiry, "[i]n determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether

there [was] a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest."   Stansbury v. California, supra at 322, quoting

California v. Beheler, 463 U.S. 1121, 1125 (1983).   A list of common indicia of

custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that the
> suspect was free to leave or request the officers to do so,
> or that the suspect was not considered under arrest; (2)
> whether the suspect possessed unrestrained freedom of
> movement during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily acquiesced to
> official requests to respond to questions; (4) whether strong
> arm tactics or deceptive stratagems were employed during
> questioning; (5) whether the atmosphere of the questioning
> was police dominated; or (6) whether the suspect was
> placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990); see United States v.
Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied --- U.S. ---, 125 S.Ct. 2514
(2005); United States v. Axsom, 289 F.3d 496, 500, 501 (8th Cir. 2002).

The Court has regarded the first three of the Griffin factors as mitigative in their effect

upon the ultimate determination, for the presence, during questioning, of one or more

of those factors would tend to weigh against a finding of custody.   On the other hand,

the remaining three factors have been characterized as coercive in their effect, since

those factors would tend to accentuate the existence of custody.   A "finding of

custody does not, however, have to be supported by all six factors."   United States

v. Galceran, 301 F.3d 927, 930 (8ᵗʰ Cir. 2002), citing United States v. Griffin, supra at 1349; see also, United States v. McKinney, 88 F.3d 551, 554 (8ᵗʰ Cir. 1996).

These factors, however, "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract."  United States v. Brave Heart, 397 F.3d 1035, 1039 (8ᵗʰ Cir. 2005), citing United States v. Czichray, supra at 827.  Instead, the Griffin factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest."  See, United States v. Czichray, supra at 827.

Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the

- 24 -

interrogation."   [Schneckloth v. Bustamonte, 412 U.S. at
226.]   See also Haynes [v. Washington, 373 U.S. 503, 513]
(1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962);
Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the
circumstances attendant upon the confession must be taken
into account"); Malinski v. New York, [324 U.S. 401, 404]
(1945) ("If all the attendant circumstances indicate that the
confession was coerced or compelled, it may not be used
to convict a defendant").   The determination "depend[s]
upon a weighing of the circumstances of pressure against
the power of resistance of the person confessing." Stein v.
New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693 (listing

the applicable considerations).

2.     Legal Analysis.   Brown has challenged the admissibility of the statements

she made during her interviews on January 13, 2006.   As Brown was placed under

arrest during the course of the second interview, the analysis implicated by her pre-

and post-arrest statements is resultantly different, and therefore, we address those statements separately.

a.    <u>Brown's Pre-Arrest Statements</u>.   The Record is devoid of any evidence that Brown was advised of her <u>Miranda</u> rights at any time prior to, or during, her first interview, and that she was not advised of those rights during the course of the second interview until after she was placed under arrest.  We further note that her statements in her first interview were made in response to direct questioning from the Agents.   Accordingly, the pertinent inquiry devolves to whether Brown was in custody, so as to require a <u>Miranda</u> advisory, prior to when she was placed under arrest and, if not, whether her statements were otherwise voluntary.

As noted, the first interview on January 13, 2006, was conducted by two Agents, at Brown's home, with Brown's express permission.   Upon arriving at Brown's residence, the officers were invited into the home, where they engaged in casual conversation with Brown.   There is no suggestion, let alone any evidence, that Brown's freedom of movement was restrained in any way, until the end of the interview, when the officers placed a "freeze" on her house.   Indeed, Brown spent the majority of the interview preparing a meal for her children.   While the officers failed to inform Brown of her right to terminate the interview, or to ask them to leave, there is

no indication that Brown was inclined to be anything other than cooperative, as she was not the focus of the initial investigation. In addition, she never instructed the officers to leave her premises, or to cease their questioning.

Moreover, there is nothing to suggest that the Agents employed any deceptive stratagems, strong arm tactics, or even raised their voices, at any time during the interview. The first interview was conducted in less than one half-hour, and ended with Hodapp leaving to obtain a Search Warrant, which was required because Brown would not consent to a search of her home. Furthermore, Brown was not arrested, nor taken into custody, until during the course of the second interview in the evening, after the discovery of narcotics, and drug paraphernalia, in her residence. We also note that Brown was questioned in her own home, and that she invited the officers in without any evidence of concern. As our Court of Appeals has observed:

> When a person is questioned "on his own turf," United States v. Rorex, 737 F.2d 753, 756 (8th Cir. 1984), we have observed repeatedly that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); see also United States v. Wolk, 337 F.3d 997, 1007 (8th Cir. 2003); Axsom, 289 F.3d at 502; United States v. Sutera, 933 F.2d 641, 647 (8th Cir.1991).

United States v. Czichray, supra at 826.

- 27 -

Accordingly, applying the <u>Griffin</u> factors, we find that Brown was not in custody during the first interview on January 13, 2006.

The foregoing analysis is also applicable to the second interview, which was conducted prior to Brown's arrest, and which was contemporaneous with the execution of the Search Warrant that was required when Brown refused consent to search her home. With the exception of being arrested at the close of the pre-arrest interview, none of the <u>Griffin</u> factors weigh in favor of a finding of custody.

The evidence established that Hodapp informed Brown, at the beginning of the second interview, that she was neither in custody, nor under arrest. While the residence was "frozen" prior to the execution of the Search Warrant, there is no showing, however slight, that Brown's movement in or outside of the home was physically restricted in any manner, and Brown later confirmed that the officers had merely sat quietly, and awaited the arrival of the Warrant. There is no intimation in the evidence that Brown was restricted in her freedom to leave her residence, had she chosen to do so, or in her ability to summon others to her home for companionship or advice. We recognize that Hodapp had instructed Brown to refrain from calling anyone on her cellular phone, but he told her to simply wait until he had left the premises. <u>Government Ex. 2</u>, at p. 23. We also find that the second interview was a

continuation of the first interview, in which Brown had freely participated. Accordingly, the mitigating factors all counsel a finding that Brown was not in custody, prior to her actual arrest.

As to the aggravating factors, Brown was arrested during the course of the interview, after she had invoked her right to refuse to answer any further questions. However, there is no evidence that Hodapp employed any deceptive stratagems, or strong arm tactics, throughout the interview.  As was noted previously, the interview took place at Brown's home, where interviews are less likely to be found custodial. See, <u>United States v. Axsom</u>, supra at 502.   Furthermore, the atmosphere of the interview was not police-dominated, as only one agent interviewed Brown, while the other officers were involved in the execution of the Search Warrant.  <u>Id.</u> (finding atmosphere casual, despite the presence of nine officers during the execution of a residential Search Warrant).   Accordingly, Brown was not in custody until such time as she was placed under arrest.

Turning to the question of whether Brown's statements were voluntary, or the product of an overborne will, we conclude that Brown has failed to sustain her contention that her statements were involuntary, as she has not proffered any proof of coercion, direct or circumstantial.  As we have addressed, Brown's interviews were

the product of her decision to cooperate with law enforcement.  She does not contend that the length of the interrogations was unduly burdensome, that she was denied any of the normal accommodations of daily living, or that the agents duped her into cooperating in their investigation.  Nor does she demonstrate the existence of any physical, or mental impairments, which would impact upon the voluntariness analysis, nor urge any age-related naivety, which could reflect a less than voluntary choice, on her part, to answer law enforcement's questions.  While, in her supporting papers, Brown urges that she "went berserk," after being told of the "freeze" that was being placed upon her home, there is no evidence that, thereafter, she acted irrationally, as her only reaction was to spontaneously open the door to her garage, and point to her washer and dryer.  In fact, in response to the agents' efforts to calm her down, she replied, "believe me baby, I'm not that crazy."  Id. at 21.

Therefore, based on the evidence as a whole, we find and conclude that Brown's will was not over-borne, and the statements, which she made during the pre-arrest interviews on January 13, 2006, were voluntary, and her Motion to Suppress should be denied.

  b. <u>Brown's Post-Arrest Statements</u>.[4]

  The Record demonstrates that, after Hodapp placed Brown under arrest, she was advised of her <u>Miranda</u> rights, and that she understood each of those rights.  In fact, her decision to terminate the non-custodial interview, while the search of her residence proceeded -- in combination with the discovery of contraband in her home -- precipitated her arrest.  Accordingly, her actions evinced a clear understanding that she had the right to remain silent, and to refuse to answer any of Hodapp's questions.

  However, after being advised of her rights, she voluntarily continued to make statements to Hodapp, and she did not assert, at any point during the post-arrest interview, that she wanted to invoke her right to remain silent, or to end the Agent's questioning of her.  After she had terminated the pre-arrest interview, and she was asked if she understood her rights, she stated, "I can't do nothing but sit here and I'm being honest with you like I said."  <u>Government Ex. 3</u>, at p. 11.  Notably, her initial

---

[4]The focus of Brown's Motion to Suppress Statements was to lay the groundwork for suppressing the evidence which subsequently was presented to a Minnesota Court in support of the issuance of a Search Warrant.  As a consequence, Brown has not advanced, orally or in writing, any objection to the admissibility of the evidence which was secured after her arrest.  As a result, we address this issue in the interests of completeness.

comments, after being advised of her right to counsel, and to silence, were entirely spontaneous, and not in response to any question. While Hodapp did question her as to her statements, her continued insistence in explaining her actions reflects her waiver of any right to remain silent. See, United States v. Hatten, supra at 262; United States v. Cody, supra at 775.

We further find nothing in the transcripts to so much as intimate that Brown behaved erratically, or was unresponsive to the Agents' questions. Likewise, there is nothing in the Record to suggest that the Agents employed coercive tactics which were so overreaching as to overcome Brown's free will. See, e.g., Sheets v. Butera, 389 F.3d 772, 778 (8th Cir. 2004)("[E]ven though the police use overreaching tactics such as the use of threats or violence, or the use of direct or indirect promises, such promises or threats will not render the confession involuntary unless it overcomes the defendant's free will and impairs [her] capacity for self determination."), citing Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002), cert. denied, 540 U.S. 893 (2003). "It goes without saying that the interrogation of a suspect will involve some pressure," as "[t]he very purpose is to elicit a confession." Id. at 779, citing United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002). While we recognize that Hodapp

informed Brown of the potential for a sentence in a Federal prison, that was neither false, nor coercive.

Accordingly, having found that the Agents fully complied with their obligations under <u>Miranda</u>, and that Brown's statements were not otherwise involuntary, we recommend that Brown's Motion to Suppress her post-arrest statements should also be denied.

C.    <u>Burrell's Motion to Suppress Evidence Obtained by Search and Seizure</u>.

Burrell challenges the legitimacy of the initial traffic stop of the vehicle in which he was traveling, his arrest, and the subsequent scope of the search that was incident to his arrest, which uncovered the contraband on his person.  We address each contention in turn.

1.    <u>The Validity of the Traffic Stop</u>.

a.    <u>Standard of Review</u>.  The Fourth Amendment assures that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  <u>United States Constitution, Amendment IV</u>.  "Traffic stops constitute 'seizures' within the meaning of the Fourth Amendment, see United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004), and must be reasonable under the principles enunciated in Terry v. Ohio, 392 U.S. 1, 88

- 33 -

S.Ct. 1868, 20 L.Ed.2d 889 (1968)."   United States v. Blaylock, 421 F.3d 758, 767

(8th Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 1108 (2006); see also, United States

v. Jones, 269 F.3d 919, 924 (8th Cir. 2001); citing Delaware v. Prouse, 440 U.S. 648,

653 (1979).   An essential purpose behind the Fourth Amendment's proscriptions is

to impose standards of reasonableness upon the exercise of law enforcement's

discretionary powers, so as to safeguard an individual's privacy from arbitrary

invasion by the Government.   See, Delaware v. Prouse, supra at 653-54; Marshall v.

Barlow's Inc., 436 U.S. 307, 312 (1978); Camara v. Municipal Court, 387 U.S. 523,

528 (1967).   Thus, whether a certain action is permissible, under the Fourth

Amendment, "is judged by balancing [that action's] intrusion on the individual's

Fourth Amendment interests against its promotion of legitimate governmental

interests."  Id. at 654.

In considering the extent to which a traffic stop intrudes upon an individual's

Fourth Amendment interests, the Supreme Court has held that traffic stops are

investigative detentions, not custodial detentions, and therefore, the principles of Terry

v. Ohio, 392 U.S. 1 (1968), govern the analysis of the reasonableness of the stop.

United States v. Jones, supra at 925, citing Berkemer v. McCarty, 468 U.S. 420, 439

(1984); see also, Delaware v. Prouse, supra at 663.   "Generally, a traffic 'stop must

be supported by at least a reasonable, articulable suspicion that criminal activity' has occurred or is occurring." United States v. Blaylock, supra at 767, quoting United States v. Jones, supra at 924. "A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle." Id., citing United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996).

"There is no requirement that there be a traffic violation," United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001), cert. denied, 537 U.S. 828 (2002), so long as the police officer has a reasonable suspicion that the vehicle, or its occupants, are involved in criminal activity. See, United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004), see also, United States v. Briley, 319 F.3d 360, 364 (8th Cir. 2003). "Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" which is not as demanding a standard as a showing of probable cause. Thomas v. Dickel, 213 F.3d 1023, 1025 (8th Cir. 2000), quoting Ornelas v. United States, 517 U.S. 690 (1996), quoting in turn, United States v. Cortez, 449 U.S. 411, 417 (1981); and citing, United States v. Sokolow, 490 U.S. 1 (1989).

If an investigatory stop is not justified by reasonable suspicion, any evidence derived from the stop is inadmissible at Trial. United States v. Wheat, 278 F.3d 722,

726 (8th Cir. 2001), cert. denied, 537 U.S. 850 (2002), citing Wong Sun v. United States, 371 U.S. 471, 484 (1963).  "A passenger in a motor vehicle has standing to challenge the stop of that vehicle."  Id., citing United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998).

> b.    Legal Analysis.  Given the Record presented, it is clear that Rankin had a reasonable, articulable suspicion, for effecting the stop of the vehicle that Burrell was driving.  At the time he made the stop, Rankin believed that the vehicle's windows were tinted darker than allowed under Minnesota law.  Rankin based this suspicion, in part, on his observation of the vehicle's windows, which was later tested by a tint-meter.   Given this Record, we find the traffic stop was warranted by Rankin's observations, and therefore, we find no Fourth Amendment violation in the traffic stop of Burrell's vehicle.

In so concluding, we do not overlook Burrell's suggestion  that the traffic stop was pretextual.   However, having determined that Rankin validly stopped the car, based upon a reasonable suspicion that the vehicle was in violation of Minnesota law, the Defendants' pretext argument must fail.  See, United States v. Williams, 431 F.3d 296, 298  (8th Cir. 2005)("A traffic stop is constitutional, regardless of the officer's subjective intent, if the officer had probable cause to believe a traffic violation

occurred."). As a consequence, Burrell's insinuation, that law enforcement had him "on their radars screen before the traffic stop and the discovery of drugs on his person," see, Burrell's Memorandum in Support of Motions to Suppress, at p. 2, is constitutionally irrelevant. See, United States v. Williams, 429 F.3d 767, 771 (8th Cir. 2005) ("The subjective belief of the officer that there might be illegal drugs in the vehicle does not invalidate the stop," and therefore, "a traffic-violation arrest * * * would not be rendered invalid by the fact that it was a 'mere pretext for a narcotics search.'"), quoting Whren v. United States, 517 U.S. 806, 813 (1996), quoting, in turn, United states v. Robinson, 414 U.S. 218, 221 n. 1 (1973). Having found that Rankin had the requisite reasonable, articulable suspicion, to effect the traffic stop, the issue of whether he also harbored a motive, beyond that suspicion, for initiating the stop is irrelevant, as Burrell's Fourth Amendment rights were not violated.

2.      The Subsequent Detention and Arrest of Burrell.

Once stopped, an officer may then conduct a "reasonable investigation," which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose," and he "may engage in similar routine questioning of the vehicles passengers to verify information provided by the driver." United States v.

Johnson, 58 F.3d 356, 357 (8th Cir. 1995)[internal citations omitted]; see also, United States v. Williams, supra, 431 F.3d at 298; see also, United States v. Sanchez, 417 F.3d 971, 974-75 (8th Cir. 2005).

The questioning is limited, however, to the circumstances that justified the stop. See, United States v. Tillmon, 64 F.3d 1120, 1124 (8th Cir. 1995), citing United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990). Of course, once Rankin's "observations aroused reasonable suspicions, he was entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop." United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004); see also, United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999), cert. denied, 528 U.S. 958 (1999). Moreover, any "consent given in the course of such questioning is valid so long as it is voluntary." United States v. Allegree, supra at 650, citing United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995). Moreover, incident to the traffic stop, an officer may also request that the driver and/or the passenger step out of the vehicle. See, United States v. Beatty, 170 F.3d 811, 812 (8th Cir. 1999); see also, Maryland v. Wilson, 519 U.S. 408, 415 (1997)("We * * * hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

Here, Rankin's initial questioning of Burrell was clearly appropriate, as he simply asked him for identification, and then performed a check for any outstanding Warrants.  See, e.g., United States v. White, 81 F.3d 775, 778 (8th Cir. 1996)("A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car."); United States v. Morris, 910 F. Supp. 1428, 1441 (N.D. Iowa 1995)("A detention following a vehicle stop does not exceed its reasonable scope while the law enforcement officer who made the stop makes an initial request for identification from the driver and any passengers, asks for an explanation of the presence of the occupants of the vehicle in the area, their destination and purpose, and runs a warrant check on the drivers licenses of all occupants of the vehicle, and a check on the registration of the vehicle to see if it is stolen or otherwise not in order."). Once Rankin was advised of Burrell's revoked drivers license by the radio dispatcher, Burrell's arrest was reasonable under the circumstances.  In sum, Rankin's actions, in detaining and arresting Burrell, did not convert the traffic stop into an illegal detention.

3.      Search of Burrell at the Beltrami County Jailhouse.

"Searches without a warrant are per se unreasonable subject to a few well established exceptions." United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004). One such exception is a search incident to a valid arrest. See, e.g., New York v. Belton, 453 U.S. 454, 461 (1981); Chimel v. California, 395 U.S. 752, 762 (1969); United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512 U.S. 1226 (1994). As our Court of Appeals has explained:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.

Conrod v. Davis, 120 F.3d 92, 96 (8th Cir. 1997), cert. denied, 523 U.S. 1081 (1998), citing United States v. Robinson, 414 U.S. 218, 235 (1973).

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." Id.; see also, Curd v. City Court of Judsonia, Arkansas, 141 F.3d 839, 842 (8th Cir. 1998)("Warrantless searches incident to a custodial arrest are 'justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official

custody and lawfully detained.'"), quoting <u>United States v. Edwards</u>, 415 U.S. 800, 802-03 (1974).

Applying the search incident to arrest exception, it is clear that the search of the Burrell's person was consistent with the requisites of the Fourth Amendment.  While being booked at the Beltrami County Jail, Rankin and Coyle  observed Burrell behaving suspiciously after his handcuffs were removed.   Coyle testified that he believed that Burrell might be concealing weapons in his hands.  Based on the totality of the circumstances, such showings establish both probable cause to search the contents of Burrell's hands, and a body search of his person incident to his arrest.  Accordingly, since Burrell's arrest was lawful, the search of his person, contemporaneous with his arrest and booking, was lawful in all respects.

      D.    <u>Brown's Motion to Suppress Evidence Obtained by a Warrant</u>.

In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or

contraband.[5]  Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64

F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find

probable cause, it must be demonstrated that, in light of all the circumstances set forth

in the supporting Affidavit, there is a fair probability that contraband, or evidence of

a crime, will be found in a particular, designated place.  United States v. Gladney, 48

F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir.

1993).  For these purposes, probable cause is "a fluid concept, turning on the

assessment of probabilities in particular factual contexts, not readily, or even usefully,

---

[5]Burrell also objects to the search of Brown's residence.  At the Hearing, Burrell made an offer of proof, which was not seriously undermined by the Government, concerning his "standing" to object to the search of Brown's residence.  Correctly denominated, the legal concept is not "standing," but whether Burrell held a legitimate expectation of privacy in Brown's residence.  See, Minnesota v. Carter, 525 U.S. 83, 99 (1998)(Since "Fourth Amendment rights are personal [and] may not be vicariously asserted," Rakas v. Illinois, 439 U.S. 128, 134 (1978), "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable, i.e., one which has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'").

In view of Burrell's proffer, which is supported by the evidence of Record, see Government Exh. 3, at pp. 9-10, that he was an overnight guest in Brown's house, we find that Brown had a reasonable expectation in the privacy of that residence, and we do not address the issue further.  See, e.g., Minnesota v. Olson, 495 U.S. 91, 96-100 (1990).  Since his remaining suppression arguments parallel those of Brown, we concurrently address them in the context of Brown's Motion to Suppress.

reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); see also, <u>Ornelas v. United States</u>, supra at 695.

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002). Moreover, the reviewing Court must not engage in a <u>de novo</u> review, but rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. <u>United States v. Maxim</u>, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); <u>United States v. Curry</u>, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. <u>Illinois v. Gates</u>, supra at 236.

2.      <u>Legal Analysis</u>.  Brown has presented several arguments which urge that the Search Warrant, that authorized the search of her residence, was illegally obtained. We address each of those arguments, in turn.

a.      <u>Probable Cause</u>.      Reviewing the Search Warrant Applications and Supporting Affidavits in a practical, common sense manner, and affording proper deference to the issuing Judicial Officer, we are satisfied that sufficient information was presented to establish probable cause to believe that evidence of illicit drug activity would be found in Brown's residence.  In relevant part, the Affidavits contained the observations, by several confidential informants, that Burrell had a relationship with Brown, that Burrell was involved in illicit drug activity, and one informant recounted that Burrell would frequently store "large quantities of crack cocaine described as the size of a cantaloupe which he always carries in a 'sentry' type firesafe." <u>Government's Ex. 2</u>, at 3.   The Affidavit also contained information concerning the earlier events of the day, including the officers' discovery of narcotics on Burrell's person, and Burrell's presence in Brown's home earlier that day.   The Affidavit further noted that officers had observed a firesafe in Brown's garage, which Brown denied being her's, and that Burrell had been arrested with six (6) keys to sentry-type firesafes on his person.

Brown contends that Hodapp's discovery of the firesafe in Brown's garage was impermissibly provoked by law enforcement. However, our review of the Transcript undercuts Brown's argument. After Hodapp informed Brown that her residence was frozen, she spontaneously opened the door to the garage, which allowed Hodapp to view the firesafe in plain view. We also note that, while Brown was revealing the contents of her garage, Hodapp had attempted to calm her, and had stressed that they would comply with her wishes, and obtain a Search Warrant before conducting any search of her premises. Our review of the Transcript reflects that Brown's spontaneous actions did not result from any impermissible interrogation technique, or any direction or command from the interviewing officers. Therefore, given the totality of the Record presented to the issuing Judicial Officer, we find probable cause for the issuance of the Search Warrant for Brown's residence.

Moreover, nothing in the Record supports any contention that the Search Warrant was illegally executed. The transcript of Brown's second interview reveals that the search of her home was conducted shortly after the issuance of the Search Warrant, and consistent with the terms of the Search Warrant. Accordingly, we simply have no basis for finding the Search Warrant was improperly executed.

Since both the issuance of the Search Warrant, as well as its execution, were lawful, Brown suggests that the Warrant was tainted by the assertedly warrantless, but authorized, entry into Brown's home, as well as the warrantless seizure of Brown's residence prior to the issuance of the Search Warrant. Accordingly, we are left with two (2) remaining arguments -- namely, that the "knock and talk" interview, and the freezing of Brown's residence prior to the issuance of the Search Warrant, tainted the evidence which supported the issuance of the Search Warrant.

       b.    The "Knock and Talk" Interview. The Fourth Amendment protects a home and its curtilage -- that is, the area immediately surrounding a dwelling -- from unreasonable warrantless searches. See, United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006), citing United States v. Dunn, 480 U.S. 294, 301 (1987). However, our Court of Appeals has also recognized that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors such as driveways, walkways, or similar passageways." Id. at 667, quoting United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984).

Here, Rankin and Carlson, upon learning of Burrell's connection to Brown, and of Burrell's presence in Brown's residence prior to his arrest, reasonably proceeded

to interview Brown.   They approached Brown's residence, and were welcomed into her home.  The Government, and Hodapp -- as evidenced by the transcript -- have characterized Hodapp's interaction with Brown as a "knock and talk," which is "frequently employed by law enforcement officers and has been described with approval by the Eighth Circuit Court of Appeals."  United States v. Crabtree, 2001 WL 1863538 (E.D. Mo., August 21, 2001), citing United States v. Heath, 58 F.3d 1271, 1273 n. 3 (8th Cir. 1995), cert. denied, 516 U.S. 892 (1995)("[A] 'knock and talk' is a casual conversation between the deputies and the target of an investigation, with no show of force.").

Our Court of Appeals has expressly approved of the "knock and talk" strategy, when reasonably employed by investigating officers.  See, United States v. Weston, supra at 667; see also, United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001), cert. denied, 534 U.S. 861 (2001)("Federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."), quoting United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991)("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants."), cert. denied, 502 U.S. 907

(1991), and citing, United States v. Hardeman, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999).

Here, through law enforcement's previous investigative efforts, they were aware that Burrell had spent time at Brown's residence prior to his arrest.  They further knew of Brown's relationship with Burrell, and that he had been arrested that day with narcotics on his person.   Under the circumstances presented, we find that law enforcement had a sufficient and legitimate objective in seeking to interview Brown. Furthermore, as Brown invited the agents into her home, in a congenial manner, we also find that the officers' entry into Brown's residence was consensual, and was reasonable under the circumstances.   While both Defendants now claim that Brown had ordered the Agents to leave her home, or otherwise withdrew her consent for their presence, we find no evidence to support the claim.   Simply put, our review of the transcripts of Record reflect that, at best, the claim is fanciful.   Accordingly, we conclude that the Fourth Amendment was not violated by the employment of a "knock and talk" investigative technique at Brown's residence.

        c.    The "Freezing" of Brown's Residence.  "[W]here officers, having probable cause, enter premises, and with probable cause,* * * secure the premises from within to preserve the status quo while others, in good faith, are in the

process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures." Segura v. United States, 468 U.S. 796, 798 (1984). Notably, in Segura, the period of time, during which the premises were secured while a Search Warrant was being secured, has been varyingly described as nineteen (19) hours, and roughly twenty four (24) hours. Id.; United States v. Davis, 103 F.3d 660, 671 (8th Cir. 1996), cert. denied, 520 U.S. 1258 (1997). Even if the initial entry is illegal, then evidence obtained by means of a subsequent, valid Search Warrant, is properly admissible, so long as the bases for the Warrant are independent of those obtained during the unlawful entry. United States v. Warren, 16 F.3d 247, 253 (8th Cir. 1994); see also, United States v. Conner, 127 F.3d 663, 667-68 (8th Cir. 1997).

Furthermore, the United States Supreme Court, in Illinois v. McArthur, 531 U.S. 326, 331 (2001), found that a warrantless seizure of the premises, when reasonable to maintain the status quo before the arrival of a Search Warrant, may be lawful. In McArthur, the Court applied a four-part test to determine the reasonableness of the seizure, comprising of whether: 1) the seizing officers had probable cause to believe evidence of a crime was present in the home; 2) whether the evidence would be destroyed before the arrival of the Warrant; 3) if the police reasonably balanced the

needs of law enforcement with the demands of personal privacy; and 4) the length of the seizure.  Id. at 331-33.  With the aforementioned as our guide, we find that the "freezing," or seizure, of Brown's residence, until the issuance of a Search Warrant, was reasonable.

As previously addressed, the agents had probable cause to believe that evidence, which was related to Burrell's alleged possession of narcotics, would be present in Brown's home.  Specifically, Brown had stated that Burrell had arrived at her residence during the early morning hours, and had entered her home.  Further, Brown admitted that Burrell was present in the home while she was away, and that he could have brought some materials inside the home.

As to the second factor, we note there is no specific evidence, in the Record, that any inculpatory evidence would be destroyed before a Warrant could be obtained, but it is a reasonable inference that, after being advised as to the nature of Burrell's charges, Brown could have disposed of the contraband, if the premises were left unsecured.  The investigating officers, earlier on that same day, had uncovered quantities of apparent cocaine on Burrell, in baggies, which could easily and quickly be disposed of -- if that were someone's intention.  Notably, we are not here confronted with a showing that has to satisfy a "no knock entry," for we are only

- 50 -

determining whether the showings, and reasonable inferences from those showings, are sufficient to take the precautionary measure of securing the premises until a Search Warrant could be obtained.  See, e.g., <u>United States v. Moore</u>, 956 F.2d 843, 848 (8th Cir. 1992), quoting the Nebraska Supreme Court, in <u>State v. Meyer</u>, 311 N.W.2d 520, 524 (Neb. 1981), as follows: "We believe we can take judicial notice of the fact that substances such as cocaine, LSD, and certain forms of prepared marijuana may be easily and quickly disposed of by merely flushing them down a toilet or drain, both of which were located in the residence in the case before us."

Thirdly, we conclude that the officers properly balanced the needs of law enforcement with those of Brown's privacy.  There is no suggestion, in the evidence, that the officers performed any search prior to the execution of the Warrant and, for reasons we have already detailed, we reject Brown's unsupported contention that the Agents' observed the incriminating safe, in Brown's garage, illegally.  Indeed, Brown has acknowledged that the officers, who were left at her home while the Warrant was being secured, "sat here quietly and waited on everything they're supposed to wait on so they could do their job."  <u>Government Ex.</u> 4, at p.2.  Finally, the length of the seizure was reasonable.  According to the transcripts, Hodapp returned with a Search Warrant no later than two and one-half (2½) hours after the premises was seized.

Therefore, the length of the seizure was reasonable.  See, <u>Illinois v. McArthur</u>, supra at 332-33 (two hour period of delay between seizure of a premises and a Warrant was reasonable).

In sum,  Brown refused to consent to a search of her home without a Warrant, after she had invited the officers into that home, and the officers refrained from searching until the arrival of the Warrant, which was expeditiously obtained.  As the Supreme Court observed, in <u>McArthur</u>, "[w]e have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."  <u>Id.</u> at 334.  As we had previously noted, given Burrell's presence in Brown's home hours before his arrest with narcotics on his person, we find that probable cause existed for the seizure of Brown's residence. Accordingly, we recommend that Brown's Motion to Suppress be in all respects denied.[6]

---

[6]We, likewise, have examined the second Search Warrant, which requests a DNA Buccal Swab from Burrell's Mouth, as well as the Major Case Prints from Burrell and Brown.  Notably, the parties did not address the propriety, or execution, of the second Search Warrant at the Hearing, or in their supporting papers. Accordingly, our review of the Search Warrant, as well as the supporting Application and Affidavit, finds that the issuance of the Search Warrant was proper, as probable

(continued...)

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Motion of Larry Burrell to Suppress Statements Obtained by Custodial Information [Docket No. 46] be denied.

2.      That the Motion of Tameika Brown to Suppress Statements [Docket No. 29] be denied.

3.      That the Motion of Larry Burrell to Suppress Evidence Obtained by Search and Seizure [Docket No. 44] be denied.

_____

[6](...continued)

cause had been established, as detailed previously in regards to the first Search Warrant for Brown's residence.

Similarly, we find, on the totality of the Record, that Burrell's consent to have a DNA Buccal Swab taken was freely given.  She asked whether she could refuse to do so, and she asked whether she could have a lawyer present, and, when Hodapp answered affirmatively, she agreed to conduct the swab sample on her own.

    4.      That the Motion of Tameika Brown to Suppress Evidence  Obtained by Search and Seizure [Docket No. 30] be denied.

Dated: May 10, 2006                 s/Raymond L. Erickson

                                         Raymond L. Erickson
                                         CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than May 26, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than May 26, 2006**, unless all interested parties

stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the

transcript in order to resolve all of the objections made.